Mr. Oscar Stilley Attorney at Law 5111 Rogers Avenue, #520 Fort Smith, AR 72903-2041
Dear Mr. Stilley:
You have requested certification, pursuant to A.C.A. § 7-9-107, of the popular name and ballot title for a proposed amendment to the Arkansas Constitution. I note that you have previously submitted ballot titles for similar measures. See Ops. Att'y Gen. Nos. 2001-391, 2001-211, 2001-210, 2000-020, 1999-416, 99-261, 99-200 and 97-333. Your proposed popular name and ballot title are as follows:
 Popular Name AN AMENDMENT TO ABOLISH PERSONAL PROPERTY TAXES, INCOME TAXES, AND TAXES ON USED GOODS, AUTHORIZE THE CHANGE OF TAX RATES, INCLUDING PROPERTY TAX RATES, BY INITIATIVE PETITION, ELIMINATE ALL MINIMUM MILLAGE RATES FOR PROPERTY TAXES, PROVIDE FOR EQUALITY IN DISTRIBUTION OF STATE FUNDS FOR PUBLIC SCHOOLS, PROVIDE FOR SCHOOL CHOICE BY WAY OF EDUCATION VOUCHERS PAYABLE FROM STATE EDUCATION FUNDS, AND FOR OTHER PURPOSES
 Ballot Title AN AMENDMENT TO THE ARKANSAS CONSTITUTION ABOLISHING ALL AD VALOREM TAXES ON PERSONAL PROPERTY, BY THE STATE OF ARKANSAS OR ANY OF ITS POLITICAL SUBDIVISIONS, INCLUDING, BUT NOT LIMITED TO, COUNTY AND MUNICIPAL GOVERNMENT, SCHOOL DISTRICTS, IMPROVEMENT DISTRICTS, FIRE, LIBRARY OR SERVICE DISTRICTS, AFTER DECEMBER 31, 2004, EXCEPT TO THE EXTENT NECESSARY TO PREVENT THE IMPAIRMENT OF BONDED INDEBTEDNESS EXISTING PRIOR TO THE ENACTMENT OF THIS AMENDMENT; ABOLISHING PERSONAL AND CORPORATE INCOME TAXES AND SALES AND USE TAXES ON USED GOODS, PROVIDED THAT SUCH TAXES MAY BE PHASED OUT TO ENSURE THAT STATE REVENUES FROM INCOME AND SALES AND USE TAXES DOES NOT FALL BELOW THE LEVELS OF REVENUE IN 2003; PROVIDING THAT THE PEOPLE MAY PROPOSE CHANGES IN ANY LOCAL TAX, INCLUDING BUT NOT LIMITED TO THE MILLAGE RATES IMPOSED BY POLITICAL SUBDIVISIONS OF THE STATE OF ARKANSAS, INCLUDING BUT NOT LIMITED TO COUNTY AND MUNICIPAL GOVERNMENTS, SCHOOL DISTRICTS, IMPROVEMENT DISTRICTS, FIRE, LIBRARY OR SERVICE DISTRICTS, AND ANY OTHER LOCAL TAX IMPOSED BY OR FOR ANY OF THE DESCRIBED ENTITIES, BY THE INITIATIVE PROCESS, IN THE SAME MANNER AS OTHER LOCAL INITIATIVES, UPON THE SIGNATURES OF TEN PERCENT (10%) OF THE VOTERS WITHIN THE TAXING UNIT, CALCULATED AS FOLLOWS: FOR SCHOOL TAXES, TEN PERCENT (10%) OF THE WHOLE NUMBER OF VOTES TABULATED IN THE MOST RECENT SCHOOL ELECTIONS IN THE SCHOOL DISTRICT, UPON THE MILLAGE RATE; FOR CITIES, TEN PERCENT (10%) OF THE PERSONS WHO VOTED FOR MAYOR IN THE MOST RECENT GENERAL ELECTION FOR MAYOR; FOR COUNTY TAXES, TEN PERCENT (10%) OF THE VOTES CAST IN THE MOST RECENT GENERAL ELECTION FOR CIRCUIT CLERK; AS TO ANY OTHER TAXING UNIT, AND AS TO ANY TAXING UNIT IN WHICH THE MOST RECENT MEASURING RACE WAS NOT TABULATED, ON THE SIGNATURES OF THE LESSER OF TEN PERCENT (10%) OF THE WHOLE NUMBER OF VOTERS REGISTERED WITHIN THE TAXING UNIT, OR 100 VOTERS OF THE TAXING UNIT; PROVIDING THAT CHANGES IN STATE TAXES SHALL CONTINUE TO BE CONTROLLED BY AMENDMENT 7 OF THE ARKANSAS CONSTITUTION; ESTABLISHING PROCEDURES FOR THE CALLING OF ELECTIONS ON TAXES; PROVIDING THAT IF MORE THAN ONE RATE OF TAX IS PROPOSED, THE HIGHEST RATE RECEIVING THE AFFIRMATIVE VOTE OF A MAJORITY OF THE VOTES CAST UPON THE QUESTION SHALL BE CERTIFIED AS THE LEGAL RATE; PROVIDING THAT ALL PROPOSED TAX INCREASES OR DECREASES SHALL BE PRESENTED TO THE VOTERS AT REGULARLY SCHEDULED STATEWIDE GENERAL ELECTIONS, AND NOT OTHERWISE, AFTER THE HOLDING OF THE FIRST REGULARLY SCHEDULED STATEWIDE GENERAL ELECTION IN WHICH THE TAX MIGHT BE INCREASED OR DECREASED, SUBSEQUENT TO THE EFFECTIVE DATE OF THIS AMENDMENT; PROVIDING RULES TO PREVENT THE IMPAIRMENT OF THE SECURITY OF BONDHOLDERS IN CASE OF THE REDUCTION OR ABOLITION OF TAXES; PROVIDING THAT WHERE ALL THE PROPERTY TAXES WITHIN A COUNTY ARE ABOLISHED, THE POSITIONS OF TAX ASSESSOR AND TAX COLLECTOR SHALL BE ABOLISHED AS SOON AS PRACTICABLE; ABOLISHING ALL MINIMUM MILLAGE RATES; PROVIDING THAT NEITHER THE STATE NOR ITS SUBDIVISIONS SHALL BE REQUIRED TO MAINTAIN ANY PARTICULAR LEVEL OF EDUCATION FUNDING; PROVIDING THAT STATE FUNDS FOR PRIMARY AND SECONDARY EDUCATION SHALL BE DISTRIBUTED EQUALLY ON A PER PUPIL BASIS, WITH RESPECT TO ALL STUDENTS OF A GIVEN AGE GROUP, UNLESS OTHERWISE REQUIRED BY LAW SUPERIOR TO THIS CONSTITUTION; PROVIDING THAT THE STATE OF ARKANSAS SHALL HAVE NO AUTHORITY TO REGULATE THE QUALIFICATIONS OF TEACHERS, STUDENT-PUPIL RATIOS, MINIMUM OR MAXIMUM SCHOOL OR CLASS SIZES, OR THE SALARIES OF TEACHERS OR OTHER EMPLOYEES OF ANY PUBLIC SCHOOL DISTRICT; PROVIDING THAT PROPERTY TAXES FOR SCHOOLS SHALL BE USED SOLELY TO PROVIDE EDUCATIONAL SERVICES IN THE SCHOOL DISTRICT IN WHICH THE TAXED PROPERTY LIES; PROVIDING THAT IF PARENTS ELECT TO ENROLL THEIR CHILDREN IN A PUBLIC SCHOOL OTHER THAN THE SCHOOL THE CHILD WOULD ATTEND BY DEFAULT, THE ALLOCATION AND DISTRIBUTION OF FUNDS FOR REDEMPTION OF VOUCHERS SHALL BE LEFT TO THE DISCRETION OF THE ARKANSAS GENERAL ASSEMBLY AND OTHER STATE AND LOCAL AUTHORITIES; ENTITLING THE STATE TO CONDITION THE REDEMPTION OF SUCH VOUCHERS UPON PROOF OF SATISFACTORY ACADEMIC PERFORMANCE ONLY; DEFINING "SATISFACTORY ACADEMIC PERFORMANCE" TO MEAN ACADEMIC PROGRESSION TO THE NEXT GRADE LEVEL, AS DEMONSTRATED BY THE RESULTS OF A TEST TO BE SELECTED BY THE PARENTS FROM A STATE APPROVED LIST AND ADMINISTERED BY THE STATE OR A REPUTABLE INDEPENDENT TESTING COMPANY AT THE PARENTS' OPTION; PROVIDING THAT THE STATE MAY DISPENSE WITH SUCH TESTING BASED UPON REASONABLE PROOF OF ADEQUATE INSTRUCTION, SUCH AS ATTENDANCE AT AN ACCREDITED SCHOOL; DECLARING FAILURE TO PAY WITHIN A REASONABLE TIME AFTER SUCH PROOF AN ILLEGAL EXACTION; PROVIDING THAT SUCH VOUCHERS OR CASH REDEMPTIONS ARE NOT TAXABLE INCOME UNDER STATE LAW; PROVIDING THAT THE RIGHT TO ATTEND A PUBLIC SCHOOL OTHER THAN THE SCHOOL ASSIGNED BY DEFAULT SHALL BE CONTINGENT ON AVAILABLE SPACE AND OTHER LEGITIMATE STATE INTERESTS; ALLOWING ANY EDUCATIONAL PROVIDER, PUBLIC OR PRIVATE, TO CONDITION ATTENDANCE UPON COMPLIANCE WITH DISCIPLINARY RULES OR OTHER LEGITIMATE INTERESTS; PROHIBITING STATE REGULATION OF PRIVATE EDUCATIONAL PROVIDERS EXCEPT FOR MINIMALLY RESTRICTIVE LAWS ESSENTIAL FOR HEALTH AND SAFETY OR FRAUD PREVENTION, WHICH DO NOT UNDULY BURDEN PRIVATE EDUCATIONAL PROVIDERS; PROVIDING FOR THE RIGHT TO A JURY TRIAL IN ANY STATE ACTION AGAINST A PRIVATE EDUCATIONAL PROVIDER; PROVIDING THAT ANY NEW STATE LAW REGULATING PRIVATE EDUCATIONAL PROVIDERS SHALL NOT BECOME EFFECTIVE UNLESS IT RECEIVES THE AFFIRMATIVE VOTE OF AT LEAST 3\4 OF THE MEMBERS OF EACH HOUSE OF THE GENERAL ASSEMBLY; PROVIDING THAT THE AMENDMENT SHALL APPLY TO EDUCATION FOR LEGAL ARKANSAS RESIDENTS; AUTHORIZING THE GENERAL ASSEMBLY TO SUPPLEMENT THE VOUCHER RIGHTS CREATED HEREIN; DEFINING THE TERM "STATE FUNDS FOR PRIMARY AND SECONDARY EDUCATION" TO MEAN FUNDS APPROPRIATED BY THE GENERAL ASSEMBLY FOR THE PURPOSE OF FINANCING OR ASSISTING IN THE FINANCING OF PRIMARY AND SECONDARY EDUCATION, BUT NOT TO INCLUDE ANY PROPERTY TAXES; DEFINING THE TERM" USED GOODS" TO MEAN GOODS WHICH HAVE EITHER ONCE BEEN SUBJECTED TO A SALES AND USE TAX, OR WHICH HAVE BEEN LAWFULLY SOLD TO AN END USER OF SUCH GOODS IN A BONA FIDE TRANSACTION WHICH QUALIFIED FOR A LAWFUL EXEMPTION FROM THE PAYMENT OF SALES AND USE TAXES; PROVIDING FOR LIBERAL CONSTRUCTION IN FAVOR OF THE TAXPAYER, SEVERABILITY, AND GENERAL REPEALER OF CONFLICTING PROVISIONS; PROVIDING THAT THE AMENDMENT IS SELF-EXECUTING AND SHALL TAKE EFFECT JANUARY 1, 2005, EXCEPT AS OTHERWISE PROVIDED; REQUIRING THE ARKANSAS GENERAL ASSEMBLY TO MAKE ALL OTHER AND FURTHER LAWS AND REGULATIONS NECESSARY TO THE ENFORCEMENT OF THIS CONSTITUTIONAL AMENDMENT, IN FULL COMPLIANCE WITH THE UNITED STATES CONSTITUTION, AND FOR OTHER PURPOSES.
The Attorney General is required, pursuant to A.C.A. § 7-9-107, to certify the popular name and ballot title of all proposed initiative and referendum acts or amendments before the petitions are circulated for signature. The law provides that the Attorney General may substitute and certify a more suitable and correct popular name and ballot title, if he can do so, or if the proposed popular name and ballot title are sufficiently misleading, may reject the entire petition.
A.C.A. § 7-9-107 neither requires nor authorizes this office to make legal determinations concerning the merits of the act or amendment, or concerning the likelihood that it will accomplish its stated objective. Consequently, this review has been limited to a determination, pursuant to the guidelines that have been set forth by the Arkansas Supreme Court, discussed below, of whether the proposed popular name and ballot title accurately and impartially summarize the provisions of your proposed amendment or act.
The purpose of my review and certification is to ensure that the popular name and ballot title honestly, intelligibly, and fairly set forth the purpose of the proposed amendment or act. See Arkansas Women's PoliticalCaucus v. Riviere, 282 Ark. 463, 466, 677 S.W.2d 846 (1984).
The popular name is primarily a useful legislative device. Pafford v.Hall, 217 Ark. 734, 233 S.W.2d 72 (1950). It need not contain detailed information or include exceptions that might be required of a ballot title, but it must not be misleading or give partisan coloring to the merit of the proposal. Chaney v. Bryant, 259 Ark. 294, 532 S.W.2d 741
(1976); Moore v. Hall, 229 Ark. 411, 316 S.W.2d 207 (1958). The popular name is to be considered together with the ballot title in determining the ballot title's sufficiency. Id.
The ballot title must include an impartial summary of the proposed amendment or act that will give the voter a fair understanding of the issues presented. Hoban v. Hall, 229 Ark. 416, 417, 316 S.W.2d 185
(1958); Becker v. Riviere, 270 Ark. 219, 223, 226, 604 S.W.2d 555
(1980). According to the court, if information omitted from the ballot title is an "essential fact which would give the voter serious ground for reflection, it must be disclosed." Bailey v. McCuen, 318 Ark. 277, 285,884 S.W.2d 938 (1994), citing Finn v. McCuen, 303 Ark. 418, 798 S.W.2d 34
(1990); Gaines v. McCuen, 296 Ark. 513, 758 S.W.2d 403 (1988); Hoban v.Hall, supra; and Walton v. McDonald, 192 Ark. 1155, 97 S.W.2d 81 (1936). At the same time, however, a ballot title must be brief and concise (see
A.C.A. § 7-9-107(b)); otherwise voters could run afoul of A.C.A. §7-5-522's five minute limit in voting booths when other voters are waiting in line. Bailey v. McCuen, supra. The ballot title is not required to be perfect, nor is it reasonable to expect the title to cover or anticipate every possible legal argument the proposed measure might evoke. Plugge v. McCuen, 310 Ark. 654, 841 S.W.2d 139 (1992). The title, however, must be free from any misleading tendency, whether by amplification, omission, or fallacy; it must not be tinged with partisan coloring. Id. A ballot title must convey an intelligible idea of the scope and significance of a proposed change in the law. Christian CivicAction Committee v. McCuen, 318 Ark. 241, 884 S.W.2d 605 (1994). It has been stated that the ballot title must be: 1) intelligible, 2) honest, and 3) impartial. Becker v. McCuen, 303 Ark. 482, 798 S.W.2d 71 (1990), citing Leigh v. Hall, 232 Ark. 558, 339 S.W.2d 104 (1960).
Having analyzed your proposed amendment, as well as your proposed popular name and ballot title under the above precepts, it is my conclusion that I must reject your proposed popular name and ballot title due to ambiguities in the text of your proposed measure. A number of additions or changes to your ballot title are, in my view, necessary in order to more fully and correctly summarize your proposal. I cannot at this time fairly or completely summarize the effect of your proposed measure to the electorate in a popular name or ballot title without the resolution of the ambiguities. I am therefore unable to substitute and certify a more suitable and correct ballot title pursuant to A.C.A. § 7-9-107(b).
Following are the ambiguities I find most prominent in the text of your proposed measure. I must alert you to the fact that this list is not intended to be exhaustive.
 (1) Section 1(b) of the proposed measure abolishes and prohibits personal and corporate income taxes, but authorizes the General Assembly to phase out those taxes so that state tax revenue from income taxes and sales and use taxes " in the years during the phase out" are equal to the total state tax revenue from income taxes and sales and use taxes for the year 2003. It is unclear how long the phase out period is intended to be. Given the ambiguity of this language, this period could theoretically continue indefinitely. Moreover, this provision could be interpreted to be based on an underlying assumption that sales tax and other tax rates will increase substantially. If this is indeed the underlying assumption of this provision of the measure, that fact should be pointed out to the voters.
 (2) Similarly, Section 1(c) abolishes sales and use tax on used goods, but permits the continued collection of those taxes "to the extent necessary to ensure that the total state income taxes and sales and use taxes for all years subsequent to the year 2003 are at least equal to the total state income taxes and sales and use taxes for the year 2003." Again, it is unclear what period of time is to be included in calculating how long the abolished sales and use taxes can continue to be collected, and whether the underlying assumption is that other tax rates will increase.
 (3) The proposed measure contains no provision addressing the administration of the referenced phase-out procedure or who is to have responsibility for the continuing collection procedure that may be required. Although the measure may intend that the General Assembly address this issue, the question is made unclear by the language of Section 8 of the measure (discussed below in No. 13).
 (4) Section 2 of the proposed measure is entitled, in part," All Tax Rates to be Decided By Voters — Right to Control Tax Rates By Petition." This title, as well as most of the language of this section, appears to indicate that the voters are authorized to propose and approve changes in tax rates. However, Subsection (d) refers to the possibility of the abolishment of property taxes altogether. The section is thus unclear as to its intent. Moreover, the last sentence of Subsection (a) refers to the requirement of voter approval for the imposition of taxes by local taxing authority. It is unclear whether this provision is intended to operate as an exception to the measure's earlier abolishment and prohibition of certain types of taxes. Another problem with this section of the measure is that it makes reference to the voters' ability to change various taxes, including" any other local tax[.]" This phrase is not defined, nor is its intended scope apparent. In addition, it is unclear whether this section is intended to grant state voters the right to determine local tax rates for other localities than those in which they reside.
 (5) Section 2(d) of the proposed measure provides that if all property taxes are abolished, "the positions of tax assessor and collector shall be abolished as soon as practicable." First, it is unclear whether these positions are to be abolished automatically, or what procedure is to be implemented for their abolishment. In addition, this provision gives rise to a question as to what collection and administration procedures are to be implemented in the event that the voters in a county in which the referenced positions have been abolished subsequently re-impose the property tax, pursuant to Subsection (a), last sentence. This provision also leaves open the question of which officers are to be charged with performing any tasks currently required by law to be performed by the assessor and collector that are not premised upon the existence of a property tax.
 (6) Your proposed measure contains provisions that purport to protect the interests of the holders of bonds that are secured by tax proceeds. However, the measure does not indicate the specific procedure by which such bondholders' interests are to be protected.
 (7) Section 3 of the proposed measure contains the following provision: "The State shall distribute state funds for primary and secondary education equally on a per pupil basis, with respect to all students of a given age group[.]" It is unclear whether the reference to "age group" is intended to be interpreted literally, or whether it is intended to refer instead to grade levels. This ambiguity could be problematic, given the fact that all pupils in a particular grade level are not of the same age group. Section 3 goes on to provide: "The General Assembly may in its discretion distribute all or part of state funds for primary and secondary education conditioned on satisfactory academic progress as defined herein." This provision seems to be in direct conflict with the immediately preceding sentence requiring equal distribution of state funds. If it is intended to constitute a specific exception to that preceding provision, that fact should be made clear.
 (8) The final subsection of Section 3[1] of the proposed measure states: "Property taxes levied and collected for schools shall be used exclusively for the provision of educational services in the school district in which the taxed property shall lie." The term "educational services" is not defined. In light of the restraints on the state's ability to regulate public education (also contained in Section 3), it is unclear how much discretion the individual school districts are intended to have in determining what constitutes "educational services."
 (9) Section 4 of the proposed measure provides a right of school choice and requires that if the school chosen by a child's parents or guardians is not a public school, "the State shall provide the parents or legal guardians of that child a voucher redeemable for cash." The proposed measure does not state the amount for which vouchers will be redeemable, nor does it provide any guideline for making this determination. Moreover, the measure does not designate any state officer or entity who will be responsible for making the determination or for administering the required redemption. This ambiguity is particularly troubling in light of the fact that the measure also states: "Failure to pay the amounts set forth herein within a reasonable time . . . shall constitute an illegal exaction." Moreover, I note that this reference to "an illegal exaction" could signal a substantial change in illegal exaction jurisprudence, because the described failure to pay does not fit the Arkansas Supreme Court's historic interpretation of "illegal exactions." If such a change in the law is the intent of this provision, that fact should be pointed out to the voters.
 (10) Section 4(b) of the proposed measure states: "Notwithstanding the foregoing, the right to attend a public school other than the school assigned by default shall be contingent on available space and other legitimate state interests." Given the substantial restraints on the state to regulate public schools, set forth in Section 3, it is unclear whether the recognition of "legitimate state interests" in Section 4 conflicts with those restraints, or constitutes an exception to those restraints. If it constitutes an exception, the measure should provide some guidance as to what might constitute a legitimate state interest.
 (11) Similarly, the extent of the measure's restraints on the state's regulatory authority over both public and private schools is unclear in light of the provision of Section 5 that permits the state to require remedial action for students who fail to maintain grade level.
 (12) Section 5 of the proposed measure requires the state to condition payment of vouchers on satisfactory academic progress, but permits the state to dispense with testing as proof of that progress. Yet the measure's definition of "satisfactory academic progress" (set forth in Section 7) appears to entail testing. The interaction of these two provisions should be clarified.
 (13) Section 8 of the proposed measure provides in part: "The provisions of this amendment shall to the extent possible be self-executing and shall take effect January 1, 2005, except as otherwise herein provided. The General Assembly, and any and all state or local rule making authorities, shall be required to make all other and further laws and regulations necessary to the enforcement of this Constitutional Amendment[.]" This language is manifestly unclear. The measure gives no guidance whatsoever as to how to determine the extent to which self-execution is possible, or who is to make that determination. No individual or entity, nor any legislative or rule-making body who would be affected by this provision will be in a position to determine whether, when, or the extent to which the measure will be in effect on January 1, 2005, or whether, instead, further legislation will be required. Moreover, it is unclear how this measure could be enforced.
 (14) The final sentence of Section 8 states: "The General Assembly is also hereby expressly authorized to create voucher rights additional to those mandated by this amendment." The intent and parameters of this provision are unclear. If different, additional, or more extensive vouchers are to be authorized, the measure should provide more specific guidance regarding them.
 (15) I note that your proposed measure is complex and addresses various different issues, thus resulting in a lengthy ballot title. Although Amendment 7 does not impose a single subject limitation on proposed constitutional amendments, the Arkansas Supreme Court has expressed concern about measures that are too complex to be adequately summarized in a ballot title. As I have done before, I must warn you of the particular hazards attendant to the ballot title of a lengthy and complex proposal such as yours. The ballot title for such a measure must avoid both the danger of being too lengthy and the danger of having serious omissions. More specifically, the title cannot be so lengthy as to cause voters to violate the voting booth time limitations, yet it must not omit any of the proposed measure's important factors. For this reason, I must point out that with any proposed amendment of considerable length and complexity such as yours, the sponsor runs the risk of a challenge and of a finding by the court that the ballot title is unacceptable, either because it is too "complex, detailed, and lengthy," or because it has "serious omissions." See, e.g., Page v. McCuen, 318 Ark. 342, 884 S.W.2d 951
(1994). See also Walker v. Priest, 342 Ark. 410, 29 S.W.3d 657 (2000). This concern may be increased where the measure covers more than one subject matter area. See, e.g., Walker v. Priest, supra, (upholding the "CHART" tobacco settlement act ballot title, but stating that ". . . here again, as was the case in Newton, [Newton v. Hall, 196 Ark. 929, 120 S.W.2d 364 (1938)] `we have an amendment which deals only with [a] single question,' Newton, 196 Ark. at 948, which helps confirm our confidence in our voters' ability to understand this ballot title.")
 (16) Finally, I caution that if your proposed measure would result in a loss of tax revenues that could impact upon existing programs and services that are currently supported by the revenues that would be lost, the measure and its title must notify voters of this potential impact. Kurrus v. Priest, 342 Ark. 434, 29 S.W.3d 669 (2000).
I reiterate that the foregoing discussion of potential problems in the text of your proposed measure is not intended to be exhaustive. But in any event, the failure of the proposed amendment to address the foregoing items adequately could result in a misleading ballot title. I am reluctant to interject my own interpretation of your measure on these points into a ballot title or popular name given my uncertainty as to the precise underlying assumptions. These questions must be addressed in your measure and ballot title.
As previously noted, my office does not concern itself, in the certification of ballot titles and popular names, with the merits, philosophy, or ideology of proposed measures. I have no constitutional role in the shaping or drafting of such measures. My statutory mandate is embodied only in A.C.A. § 7-9-107, and my duty is to the electorate. The Court has confirmed that a proposed amendment cannot be approved if "[t]he text of the proposed amendment itself contribute[s] to the confusion and disconnect between the language in the popular name and the ballot title and the language in the proposed measure." Roberts v.Priest, 341 Ark. 813, 20 S.W.3d 376 (2000). The Court stated: "[I]nternal inconsistencies would inevitably lead to confusion in drafting a popular name and ballot title and to confusion in the ballot title itself." Id.
Where the effects of a proposed measure on current law are unclear or ambiguous, it is impossible for me to perform my statutory duty to the satisfaction of the Arkansas Supreme Court without clarification of the ambiguities.
My statutory duty, under these circumstances, is to reject your proposed ballot title, stating my reasons therefor, and to instruct you to "redesign" the proposed measure and ballot title. See A.C.A. §7-9-107(c). You may, after clarification of the matter discussed above, resubmit your proposed amendment, along with a proposed popular name and ballot title, at your convenience. I anticipate, as noted above, that some changes or additions to your submitted ballot title may be necessary. I will be pleased to perform my statutory duties in this regard in a timely manner after resubmission.
Sincerely,
MIKE BEEBE Attorney General
MB:cyh
[1] I note that both the third and the fourth subsections of Section 3 are designated as "(c)".